**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT PADUCAH**

WILLIAM SCOTT WOOLER                                                    PLAINTIFF

v.                                                            CIVIL ACTION NO. 5:05CV-247-R

HICKMAN COUNTY, KENTUCKY, et al.                                       DEFENDANTS

**<u>MEMORANDUM OPINION</u>**

**INTRODUCTION**

This matter is before the Court to consider two pending motions for summary

judgment filed by the Defendants[1] (DN 78, 81).  The primary question raised in these motions is

whether the Defendants were deliberately indifferent to the serious medical needs of the

Plaintiff, Wooler, while he was confined at the Hickman County Detention Center in 2004 and

2005.

Wooler claims that during his confinement at the jail he was unnecessarily

exposed to Methicillin-Resistant Staphylococcus aureus (MRSA), an antibiotic-resistant staph

bacteria.  According to him, Dr. Smith, jailer Robert Tarver and jail nurse Peggy Tarver

knowingly violated their constitutional duty to protect him from MRSA by (1) keeping him in a

cell with another inmate who had a draining MRSA skin lesion; (2) failing to educate him and

other inmates about the serious dangers of MRSA and how to avoid infection; (3) declining to

isolate inmates who had draining MRSA lesions on their skin; (4) neglecting to take adequate

sanitary measures to decontaminate the communal toilets and showers used by the inmates; (5)

_____

[1] The named Defendants are: Hickman County, Kentucky; former jailer Robert Tarver;
former jail nurse Peggy Tarver; and jail contract physician Dr. Bruce Smith.  The Tarvers and
Dr. Smith are named in their official and individual capacities.

permitting the Plaintiff to change the soiled bandages of a MRSA infected inmate; and (6) refusing to obtain bacterial cultures from suspected MRSA-infected inmates to confirm their infected status.

Defendants argue that they are entitled to judgment as a matter of law because the material facts, even when viewed most favorably to Wooler, provide no basis on which a reasonable juror could find that any of them was deliberately indifferent to his serious medical needs. Defendants maintain that the undisputed material facts show that they took every reasonable health precaution available under the circumstances to prevent the spread of MRSA at the jail and to effectively treat those inmates believed to be infected. Both Wooler and the Defendants have fully briefed the issues. Accordingly, the motions for summary judgment are now ripe for review.

## FINDINGS OF FACT

The material facts in this action are not genuinely disputed. Wooler is a former Kentucky prisoner. On April 20, 2004, Wooler was convicted in state court of second-degree escape. (Wooler depo. at 27). Authorities initially placed him in the Graves County Jail, along with another prisoner, C.P.[2] Wooler remained there for approximately two months until he was transferred on June 17, 2004, to the Defendant Hickman County Detention Center (jail), were he ended up being housed in cell 147 sometime in July, 2004. (Wooler depo. at 27, 30). A little over two months passed before C.P. arrived at the jail on September 23, 2004. (Wooler depo. at 124). C.P. was placed in Wooler's cell, a 5-man cell with one sink, shower and toilet for 10

---

[2] "C.P." has been referred to as "Inmate A" in other pleadings.

2

prisoners.

Sometime during the first two weeks of September, 2004, nurse Tarver received a copy of the Kentucky Department of Corrections Healthcare Service Protocol for Methicillian-resistant Staphylococcus aureus (DN 78, Exh. 5, KDOC Protocol) from her husband, jailer Robert Tarver.  (DN 93, Exh. H, P. Tarver Depo. at 63).  The protocol was prepared by the Medical Director for the Kentucky Department of Corrections (KDOC), Dr. Haas in August of 2004.  (DN 93, Exh. A. Haas Depo. at 6-12).  The KDOC distributed the MRSA health care protocol to jailers throughout Kentucky that September to assist jail medical staff in the education, prevention, diagnosis, tracking, reporting and treating of MRSA infections.  (Id.). The protocol, while not binding policy outside of the KDOC state prison system, was intended by Dr. Haas to inform jailers how best to manage and contain MRSA outbreaks and MRSA-positive prisoners.  (DN 93, Exh. A, Haas Depo. at 13-14).  Within the MRSA protocol were a series of suggestions concerning the prevention, screening, infection control, outbreak management and treatment of MRSA (DN 78, Exh. 5, KDOC Protocol).  The primary prevention measures identified in the protocol were: a hand hygiene education program for staff and inmates to encourage adequate hand washing; a regular sanitation regimen to include routine cleaning of inmate housing and bathroom areas with detergent disinfectant; and comprehensive screening of all new and recently hospitalized inmates for any inmates who report boils, sores or insect bites or other skin infections.  (Id. at 3-5). The KDOC protocol also suggested measures for infection control, one of which included medical isolation of inmates diagnosed with MRSA who have uncontained drainage.  (Id. at 5-6).  The protocol advised that infected inmates should have separate toilet and shower facilities whenever possible, and such items should be decontaminated

3

following use.  (Id. at 6).  As for treatment, the KDOC protocol recommended that inmates suspected of MRSA infection be promptly treated with an appropriate antibiotic to be decided by the care provider in accordance with standard care for the treatment of MRSA infections.  It was also recommended that routine bacterial cultures be obtained whenever possible from draining wounds.  (Id. at 7-8).  This protocol was included with the jail's policy manual, and nurse Tarver began to prepare a monthly MRSA tracking report to track MRSA and any other infections at the jail (DN 93, Exh. H, P. Tarver Depo. at 65).  She also advised jail staff that MRSA could potentially be a problem for the jail, described the type of wounds or skin conditions that may indicate an infection, and instructed staff to report any observations of same to the jail medical staff.  (Id. at 66).

        Soon after his arrival in September, 2004, C.P. showed Wooler an open wound on his leg.  Wooler recalled that the affected area "looked pretty bad," ... "like a bullet hole." (Wooler Dep. at 124-126).  C.P. initially did not tell the jail medical staff about the draining abscess on his leg.  (Id. at 123-24).  Instead, he attempted to clean out the hole himself with tissue paper on his little finger.  (Id.).  Wooler, on seeing the draining abscess, told C.P. that he had better go to the doctor.  (Wooler Depo. at 126-127).  When C.P. did not immediately notify the medical staff, other unnamed inmates at the jail reported to RN Peggy Tarver on October 11, 2004, that C.P. had a draining wound.  Prior to October 11, C.P. remained in cell 147 with Wooler, talking and playing cards with him.  Wooler admits that it is possible he was exposed to MRSA during this time.  (Id. at 125-26).

        Nurse Tarver's MRSA tracking report for that October notes that Dr. Bruce Smith, the contract physician for the jail (DN 78, Exh. 1, Dr. Smith contract), examined C.P. on

October 11, 2004, after Nurse Tarver examined him earlier in the day.  (DN 81, Exh. N, MRSA report Oct. 2004).  C.P. reported to her that he had a "spider bite."  Dr. Smith upon examination arrived at a diagnosis of "probable MRSA."  (Smith Depo. at 60).  A culture was not performed on the wound and so the diagnosis was not confirmed.  Dr. Smith prescribed a week-long regimen of Clindamycin, 150 mgs. q.i.d.  After a followup examination seven days later on October 18, he extended the antibiotic medication for another five days.  (Id.).  Nurse Tarver reported that the jail medical staff was able to contain the drainage from C.P.'s wound with a dressing.  (Id.).  According to her tracking report, C.P.'s linens were stripped and laundered.  (Id.).  He was instructed to keep his hands off of his wound and to perform hourly hand washing, use clean towels and wash cloths and place them and his linens in a laundry bag marked "contaminated."  (P. Tarver Depo. at 81-82).  Throughout this time, C.P. remained in cell 147.  He was not placed in medical isolation.

C.P. was not the only inmate at the jail who was diagnosed with probable MRSA infection that October.  Another prisoner, M.W., was examined by Nurse Tarver on the same day, October 11, 2004, with complaints of "a spider bite" on his right forearm. (DN 81, Exh. N). MW had been housed in a separate cell at the jail, but was placed in cell 147 sometime before November 6, 2004, when Tarver prepared her MRSA tracking report for October.  That report reflects that Dr. Smith also examined inmate MW on October 11.  (Id.). Once again the doctor arrived at a diagnosis of "probable MRSA," without a culture to conclusively confirm the diagnosis.  (Id.).  He prescribed the same antibiotic medication regimen for MW, who also was examined the following week and received five days of additional antibiotics.  (Id.).  Nurse Tarver indicates in her tracking report that the affected area on MW's forearm never developed

drainage.  By October 28 his arm was healed.  (Id.).

When Dr. Smith treated inmates MW and C.P. on October 11, 2004, he did not know whether they shared the same cell, or whether any non-infected inmates were housed with either of them.  (Smith Depo. at 70, 76).  He did not order that either infected inmate be placed in isolation.  Dr. Smith told both inmates to wash their hands often and to expect to have more such skin eruptions in the future.  At the time, the doctor was aware that the jail had received a written healthcare protocol from the KDOC for the prevention and treatment of MRSA.

Following the October 11, 2004 treatment by Dr. Smith, C.P. spent the next six weeks in cell 147 with Wooler without incident.  No further outbreaks were reported by C.P. until November 24, 2004, when Nurse Tarver's MRSA tracking report indicates that C.P. was found to have three infected areas on his face.  (DN 92, Exh. M, MRSA report of Nov. 2004).  C.P. was treated by a Graves County doctor with a week-long regiment of Vibramycin, 100 mgs.  (Id.).  The following week, on November 30, 2004, Nurse Tarver's tracking report indicates that C.P. developed a skin ulcer on his upper thigh.  (Id.).  He was taken to Dr. Smith on Thursday, December 2, and the following day, on Friday, December 3.  (DN 81, Exh. O (filed under seal) C.P. med. records); (DN 92, Exh. M, MRSA report of Dec. 2004).

As part of the December 3rd medical treatment, Dr. Smith drained C.P.'s wound, placed a gauze "wick" into the open wound to keep it open and pull the drainage from it and bandaged it.  (Smith Depo. at 77) (Tarver Depo. at 88-90).  After C.P. returned to jail from the doctor's office, his bandages required changing to keep them dry.  Over the weekend of December 4-5, according to Wooler, none of the jail medical personnel were present to change the bandages.  (DN 81, Exh. S, Wooler's response to interrogatories).  A jail guard advised C.P.

6

that he would have to find another inmate to help him change his dressing.  (Wooler Depo. at 42-44).  C.P. then asked Wooler to assist him. Wooler agreed to do so.  According to Wooler, he helped C.P. change his bandages covering the wick four or five times over the course of the weekend.  (Wooler Depo. at 44).  Each time this happened, Wooler and C.P. were taken to the jail medical room.  (Id.).  Wooler washed his hands before and after performing the changing procedure and wore latex gloves while actually changing the bandages themselves.  (Wooler Depo. at 47).  Dr. Smith, Robert Tarver and Peggy Tarver were not aware that Wooler had changed C.P.'s bandages.  (DN 81, Exh. T. R. Tarver Aff.) (P. Tarver Depo. at 91-92).  Jail policy does not permit inmates to assist one another in this respect.  (DN 81, Exh. U, Policy).  Deputy jailers, some of whom are emergency medical technicians, are supposed to perform such procedures when medical staff are not available.  (P. Tarver Depo. at 91-92).

On December 7, 2004, four days after C.P. had his wound drained by Dr. Smith on December 3, and two days after Wooler helped change C.P.'s bandages, Wooler noticed four scabbed over areas on his left thigh.  (DN 78, Exh. 4, medical notes p. 1).  None of the areas was abscessed. Wooler thought that they were merely spider bites.  (Id.).  A jail staff member reported to the medical department that Wooler may have a staph infection.  (Id.).  Wooler did not seek medical assistance for these areas on his left thigh.  Not until six weeks later, on January 18, 2005, did Wooler request medical attention from Nurse Tarver.  (DN 81, Exh. V, jail med. records of Wooler).

Nurse Tarver noted in her medical notes and MRSA tracking report for January (DN 92, Exh. M, MRSA report of Jan. 2005) an unopened abscess on Wooler's left buttock, three areas of scabbing on his thigh, and another on his left wrist.  (DN 78, Exh. 4, med. notes p.

7

1).  Wooler was examined immediately by Dr. Smith who diagnosed him with a staph infection. (Id.).  Dr. Smith prescribed a 14-day course of Bactrim DS tablets.  (Id.).  Nurse Tarver instructed Wooler on frequent hand washing, not sharing personal items or sitting on other inmates' beds.  (Id.).  She directed that all of the cells at the jail be washed with bleach; instructed that all inmates be provided antibacterial soap; purchased extra towels and wash cloths for the inmates, who were instructed not to use them more than once; had all the beds stripped and the linens washed; and posted a notice in each jail cell to inform the inmates on the symptoms of MRSA and how to prevent infection.  (Id.). All of the inmates in cell 147 supposedly were given the opportunity to relocate to another cell, although Wooler recalls no such offer.

            The MRSA tracking report for January 2005, indicates that by February 2, all of the affected areas on Wooler were healed.  (Id.).  The following month, on March 7, 2005, however, Wooler was noted to have an abscess on his back.  (DN 92, Exh. M, MRSA Report of Mar. 2005).  As before, he was examined by Dr. Smith, who again prescribed treatment with Bactrim DS for ten days.  (Id.) (DN 82, Exh. V, W. jail med. records).  Wooler returned to the doctor the following day on March 8 to have a cyst drained.  (Id.).  His antibiotic prescription was extended for five days.  (Id.).  Nurse Tarver's MRSA tracking notes for March indicate that Wooler was placed in medical isolation while his abscess was draining to prevent the possible spread of infection.[3]  (Id.).

_____

    [3]  The same MRSA tracking report of March 2005, indicates that inmate C.P. was observed by the kitchen supervisor to be hiding an abscess on his upper wrist with a long-sleeved shirt and appeared to have the beginnings of another abscess in his nose.  (DN 92, Exh. M, MRSA report of Mar. 2005).  C.P. was taken immediately to the doctor on March 7, and started on a 7-day course of Clindamycin, 150 mgs.  He was examined again by Dr. Smith on March 11,

Nurse Tarver's MRSA tracking report for April notes that Wooler developed another abscess on his back on April 19, 2005.  (DN 92, Exh. M, MRSA report of Apr. 2005). He was seen by Dr. Smith the same day and given a prescription for a 10-day course of Keflex, 500 mgs. q.i.d. (Id.).  Tarver placed Wooler in medical isolation because he would not keep his hands off of his wound.  (Id.).  The same MRSA tracking report notes that C.P. had the beginnings of an abscess on his cheek on April 29, which he appeared to be rubbing continually. (Id.).  C.P., like Wooler, was taken to Dr. Smith and diagnosed with a staph infection.  (Id.).  Dr. Smith prescribed Minocin, a nasal antibiotic.  (Id.).  C.P. too was placed in medical isolation until his abscess ceased draining.  (Id.).

In mid-June, 2005, Wooler developed a draining wound on his back.  (DN 92, Exh. M, MRSA report of June 2005).  Once again, he was taken to Dr. Smith's office.  Dr. Smith prescribed a 10-day course of Keflex, 500 mgs.  (Id.).  Nurse Tarver placed Wooler in medical isolation at the jail while his wound drained.  (Id.).  The following month, by July 13, 2005, Wooler developed another skin ulcer. (DN 92, Exh. M, MRSA report of July 2005).  Dr. Smith examined him and prescribed 10 days of treatment with Clindamycin, 150 mgs. q.i.d.  (Id.).  He returned to Dr. Smith on July 20 for a followup visit and was given Mutirecin for his nose.  (Id.). The MRSA tracking report for July notes that Wooler refused many doses of Clindamycin, as well as his nose ointment.  (Id.).

On August 31, 2005, Wooler was treated again for another abscess, along with a recurrent infection that manifested as an ulcer on his thigh on September 7, 2005.  (DN 92, Exh.

---

and noted to be healed by March 18.  He was removed from kitchen duty and placed in medical isolation until his abscess stopped draining.

9

M, MRSA rep. for Sept. 2005).  Dr. Smith once again prescribed Clindamycin.  (Id.).  Wooler

returned to Dr. Smith's office on September 19, 2005, with another ulcer.  (Id.).  On this final

occasion, he received a 10-day treatment course with Clindamycin, 4x a day.  (Id.).  As before,

the doctor and Nurse Tarver instructed him to keep his hands off the affected areas and wash

them repeatedly.  (Id.).

   On September 30, 2005, the Hickman Jail released Wooler from custody.  Two

months later, on November 22, he was treated by Dr. Beal of Benton, Kentucky, for a new

abscess that developed under his right arm.  (DN 82, Exh. AA, Dr. Beal med. records).  Dr. Beal

drained the abscess, but did not culture it nor prescribe antibiotics.  (Wooler Depo. at 77-78).

The following week, on November 28, 2005, Wooler developed a new abscess on his leg.

Another physician, Dr. Mathis, drained the abscess.  (DN 82, Exh. BB, Mathis med. records).

On that occasion, Wooler at the urging of his attorney requested that the doctor culture the

drainage to determine whether Wooler had been infected with MRSA.  (Id.).  The culture indeed

tested positive for MRSA.

   Dr. Mathis subsequently testified, however, that he could not state to a reasonable

degree of medical probability that Wooler was infected with MRSA while confined in the

Hickman County Jail or even infected with a staph infection during that time period.  (DN 82,

Exh. CC, Mathis Depo. at 13).  Wooler's own expert, Dr. Clark, conceded during his deposition

that it was possible that Wooler's MRSA infection in November of 2005, was a recurrent

infection.  (Clark Depo. at 89). It also was possible according to Dr. Clark that Wooler had been

exposed to MRSA following his release from incarceration in September, 2005.  (Id.).

   Dr. Clark conceded further during his deposition that it was equally likely that

Wooler was exposed to and infected with MRSA prior to October 11, 2004, when he was housed in cell 147 with C.P., who had an unbandaged draining wound (before C.P.'s condition was brought to the attention of any jail officials), as it was likely that Wooler was exposed and infected on the weekend of December 4-5, 2004, when he helped C.P. change his bandages after Dr. Smith had inserted the gauze wick on Friday, December 3. (Clark Depo. at 88).  In Dr. Clark's own words, the two alternative scenarios presented "equal opportunity exposure." (Clark Depo. at 88).  When presented with the anticipated testimony of the Defendant's medical expert, Dr. Raff, an infectious disease doctor (DN 81, Exh. M, opin. letter), that it is impossible to tell if Wooler contracted MRSA in the jail, Dr. Clark agreed "that assessment is logical and may be correct."  (Clark Depo. at 84).  As for his own opinion on how Wooler contracted MRSA, Dr. Clark responded that he was "not sure."  (Id.).

To complicate matters for Wooler, it is undisputed that while at the Hickman County Jail, Wooler and C.P. constructed a homemade tattoo machine using a CD motor, toothbrush, pin, spring and needle.  (Blalock Depo. at 30-32).  Inmate Blalock used the tattoo machine to give Wooler over 20 jail tattoos during the time the two men were housed in cell 147. (Id.). He also gave inmate C.P. "quite a few" tattoos with the same machine during Wooler's incarceration before October 11, 2004, the first date on which any inmates in cell 147 exhibited any staph symptoms.  (Id.).  Dr. Clark agreed in his deposition that individuals who receive jailhouse tattoos are more likely to contract a MRSA infection (Clark Depo. at 38).

## CONCLUSIONS OF LAW

The summary judgment standard of review arising under Rule 56 of the Federal

11

Rules of Civil Procedure governs consideration of the pending motions.  Under the Rule, summary judgment will be proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that no genuine issue as to any material fact exists, and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).

The party who files a motion for summary judgment bears the initial burden to show that no genuine issues of material fact exist.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 23 (1986); Yeschick v. Mineta, 521 F.3d 498, 502 (6th Cir. 2008).  This burden may be discharged by "pointing out ... an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325; Cincinnati Newspaper Guild v. Cincinnati Inquirer, 863 F.2d 439, 443-44 (6th Cir. 1988).  Once the moving party has met this initial burden, the nonmovant, after adequate time for discovery, may not rest on its pleadings to defeat the motion, but instead must identify specific material facts on which a reasonable juror could return a verdict for the nonmovant on the challenged claim or claims.  Matsushita Elec. Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

In this respect, the inquiry on a motion for summary judgment is similar to the directed verdict inquiry - - whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); McKee v. Cutter Laboratories, Inc., 866 F.2d 219, 220 (6th Cir. 1989).  The production of a mere "scintilla" of evidence by the nonmovant will not be sufficient to defeat an otherwise proper motion for summary judgment. Id.  When determining what particular facts are deemed to be material for the purpose of the

12

Rule, the Court will look to the substantive law that governs the claim or claims under consideration.  See Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476-81 (6th Cir. 1989) (extended discussion of the summary judgment standard).

As explained in the Street decision, the trilogy of Celotex, Matsushita, and Anderson have ushered in a "new era" in summary judgment jurisprudence under which the federal courts have enhanced discretion to grant summary judgment.  No longer need they independently search the record merely to deny a motion for summary judgment based upon some "metaphysical doubt as to the material facts."  Street, 886 F.2d at 1480 (citing Matsushita, 106 S. Ct. at 1356).  Summary judgment will be appropriate on a given claim when the facts, viewed most favorably to the nonmovant, would not permit a reasonable juror to return a verdict in the nonmovant's favor.

The fundamental purpose of § 1983 is "'to compensate persons for injuries that are caused by the deprivation of constitutional rights.'"  Ealy v. City of Dayton, 103 F.3d 129 (6th Cir. 1996) (quoting Memphis Community School Dist. v. Stachura, 447 U.S. 299, 307 (1986)). Its protections equally apply to the imprisoned individuals as "a civil enforcement mechanism for all inmates who suffer constitutional injuries at the hands of '[a]ny person acting under the color of state law.'"  Ford v. County of Grand Traverse, 535 F.3d 483, 495 (6th Cir. 2008) (quoting 42 U.S.C. §1983).

Wooler claims that Defendants violated his Eighth Amendment right to freedom from deliberate indifference to his serious medical needs by their failure to take action to prevent his exposure to infection with MRSA and by inadequate medical care while he was housed at the jail.  It is established beyond dispute that deliberate indifference by prison officials to the serious

13

medical needs of an inmate may constitute the unnecessary and wanton infliction of pain in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  Miller v. Calhoun County, 408 F.3d 803, 812 (6th Cir. 2005).

An Eighth Amendment claim for deliberate indifference to a prisoner's serious medical needs has both objective and subjective components.  Phillips v. Roan County, Tennessee, 534 F.3d 531, 539-40 (6th Cir. 2008).  The objective component of the claim requires that the inmate have a sufficiently serious medical need so that he or she is "incarcerated under conditions posing a substantial risk of serious harm."  Blackmore v. Kalamazoo County, 390 F.3d 890, 895 (6th Cir. 2004) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).  The Supreme Court has recognized in Helling v. McKinney, 509 U.S. 25, 33 (1993) that the exposure of an inmate to a serious communicable disease will constitute a substantial risk of harm for the purpose of the Eighth Amendment.  Id.  In fact, various federal courts have recognized that "the risk of contracting MRSA has been specifically identified ... as the type of condition which may form the basis of a medical indifference claim."  Lopez v. McGrath, Case No. C 04-4782 MHP, 2007 U.S. Dist. LEXIS 39409 (N.D. Cal. May 31, 2007) (citing Kimbel v. Tennis, Case No. 4:CV5-1871, 2006 WL 1548950 at *1 (N.D. Pa. June 5, 2006); Cunningham v. Belleque, Case No. CV-03-1239-MO, 2006 WL 468377 at *3 (D. Ore. Feb. 24, 2006)).  Accordingly, the objective component of Wooler's Eighth Amendment claim is not genuinely disputed.

The subjective component of a constitutional claim for deliberate indifference to serious medical needs requires a plaintiff prisoner to "allege facts which, if true, would show that the official being sued objectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."  Phillips,

14

534 F.3d at 540 (citing Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001)). The plaintiff prisoner need not show, however, that defendant officers acted with the specific intent to cause the prisoner harm. Id. Instead, the plaintiff need merely show that the defendants recklessly disregarded a substantial risk of serious harm to the prisoner. Farmer, 511 U.S. at 836. In other words, "deliberate indifference requires a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" Miller, 408 F.3d at 813 (quoting Farmer, 511 U.S. at 834-35). This subjective component of the deliberate indifference standard is intended to avoid the constitutionalization of medical malpractice claims. Comstock, 273 F.3d at 703. Because defendant jail officials, or any § 1983 defendants for that matter, seldom admit the subjective component, it is permitted to infer that a prison official had the required knowledge based on circumstantial evidence. Phillips, 530 F.3d at 540.

A § 1983 claim for recovery of monetary damages for the violation of one's constitutional rights is not only a constitutional claim, subject to the principles and case law set forth above, but it is also a tort claim subject to the fundamental principles of tort law. See Molnar v. Care House, Case No. 06-CV-15202-DT, 2008 WL 4092907 at *8 (E.D. Mich. Sept. 5, 2008) ("general principles of tort law govern liability imposed by § 1983") (citing Horn by Parks v. Madison County Fiscal Court, 22 F.3d 653, 659 (6th Cir. 1994)). In other words, to successfully bring a claim for deliberate indifference to his serious medical needs under the Eighth Amendment, Wooler must not only show the existence of (1) a serious medical need, and (2) deliberate indifference to that need by the Defendants, but also (3) a causal connection between the Defendants' deliberate indifference and his injuries. Calhoun v. Volusia County,

499 F. Supp. 2d 1299, 1302-03 (M.D. Fla. 2007).

   This third element is as critical as the former two elements since compensatory damages cannot be awarded for a violation of constitutional rights absent proof of actual injury, i.e. injury caused by the violation.  Stachura, 477 U.S. at 308; Carey v. Piphus, 435 U.S. 247, 264 (1978) (Plaintiff could only recover compensatory damages if he proved actual injury caused by the denial of his constitutional rights.).  Accordingly, "proximate causation is an essential element of a § 1983 claim for damages." Horn, 22 F.3d at 659 (6th Cir. 1994) (citing Doe v. Sullivan County, Tenn., 956 F.2d 545, 550 (6th Cir. 1992); Ellis v. Washington County & Johnson County, Tenn., 198 F.3d 225, 226 (6th Cir. 1999) (summary judgment appropriately entered in § 1983 action where plaintiff failed to show proximate causation)). Further, a claim for damages under § 1983 that arises from alleged deliberate indifference involving a sophisticated medical condition requires that expert testimony be offered to prove causation. Alberson v. Norris, 458 F.3d 762, 765-66 (8th Cir. 2006)("Where the complaint involves treatment of a prisoner's sophisticated medical condition, expert testimony is required to show proof of causation.")(citing Gibson v. Weber, 433 F3d 642,646 (8th Cir. 2006)).

   A body politic is a "person" within the meaning of § 1983.  Monell v. Dept. of Soc. Servs., 436 U.S. 658, 690 (1978).  "Official capacity" suits generally represent only another way of pleading an action against an entity of which an officer is an agent and is treated as a suit against the entity.  Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).  Municipal liability cannot be premised on a theory of respondeat superior.  Id. at 691.  A municipality may be held liable under § 1983 only where its policy or custom causes the constitutional violation in question.  Id. at 694.  Municipal liability may attach for policies promulgated by the official

16

vested with final policy making authority for the municipality.  Pembaur v. City of Cincinnati, 475 U.S. 469, 482-83 (1986).  Whether a given individual is such a "policymaker" for purposes of § 1983 liability is a question of state law.  Id. at 483.

The final policymaking authority of a municipality may be delegated.  Pembaur, id. at 483.  However, the "mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." Feliciano v. City of Cleveland, 988 F.2d 649, 655 (6th Cir. 1993).  In making that determination, "consideration should ... be given to whether the employee ... formulates plans for the implementation of broad goals."  Hager v. Pike County Bd. of Educ., 286 F.3d 366, 376 (6th Cir. 2002).

A municipal "custom may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice."  Memphis, Tenn. Area Local An. Postal Workers' Union v. City of Memphis, 361 F.3d 898, 902 (6th Cir. 2004).  For a custom to give rise to municipal liability, the custom "must be so permanent and well established as to constitute a custom or usage with the force of law."  Doe v. Claiborne County, Tenn., 103 F.3d 495, 507 (6th Cir. 1996) (quoting Monell, 436 U.S. at 691).

It is not unconstitutional for municipalities to hire independent medical professionals to provide on-site health care to prisoners in their jails, and to rely on medical judgments made by medical professionals responsible for prisoner care.  Graham v. County of Washtenaw, 358 F.3d 377, 384 (6th Cir. 2004).  A physician under contract with the state to provide medical services to prison inmates acts "under color of law" within the meaning of

§1983.  West v. Atkins, 487 U.S. 42 (1988).

The upshot of these legal principles is that Hickman County, Dr. Smith and the Tarvers bear the initial burden to show the Court the absence of a genuine issue of material fact and that the undisputed facts are such that a reasonable juror could not return a verdict for the Plaintiff on his claims.  If the Defendants make this initial showing, Wooler must come forward and point to disputed material facts of record on which a reasonable juror could return a verdict on his behalf.  If he cannot do so on any material element of any of his claims so that the Court would be compelled to direct a verdict for the Defendants on the affected claims, then the Court should grant summary judgment for the Defendants on the specific claims at issue.

## LEGAL ANALYSIS

Wooler's claims against all of the Defendants can be broken down into two contentions.  First, Wooler claims that he contracted MRSA while confined at the jail as a result of the jail's failure to take necessary steps to protect him from such an infection in the jail environment.  Secondly, he claims that the medical care he received for his infection was so deficient as to constitute deliberate indifference in violation of the Eighth Amendment.

**a.**       **Exposure to MRSA: The issue of Causation.**

Wooler claims that the Defendants were deliberately indifferent to a known serious health risk by placing him in an environment where he contracted MRSA.  The critical date for purposes of the Court's analysis is October 11, 2004.  It is undisputed that the report to jail officials by other inmates of C.P.'s draining leg wound was the first notice of any potential

18

health risk to Wooler.  If Wooler contracted MRSA before October 11, 2004, the Defendants cannot be held liable since there is no evidence that the Defendants were aware of any substantial risk to his health up to that time.  Plaintiff must prove by a preponderance of the evidence that it is more likely than not that he was infected with  MRSA after October 11, 2004, when the Defendants were aware that any MRSA problem existed in the jail and consciously disregarded such risk thereby causing the Plaintiff's injuries.  The Defendants may only be held liable if they elected to disregard a known, substantial risk of infection and their disregard resulted in the Plaintiff's MRSA infection.  If the evidence is such that a reasonable juror could not so find then all of the Defendants are entitled to entry of judgment as a matter of law in their favor on Wooler's § 1983 claim that the Defendants deliberately or negligently exposed him to MRSA infection.  Lack of proof of causation is also fatal to any state law claim that the Defendants' negligence resulted in his contraction of MRSA.

In analyzing the issue of causation, the Court has made the following series of assumptions favorable to Wooler.  First, the Court has assumed that the KDOC protocol on MRSA established the appropriate standard of care.  The Court made this assumption despite the testimony of Dr. Haas that the protocol is merely that and nothing more, a suggestion as to the best medical practices to be employed at local jails.  Second, the Court has assumed to Wooler's benefit that the KDOC protocol on MRSA requires the isolation of those inmates who present with draining wounds, irrespective of whether such wounds are bandaged.  This assumption is contrary to the express language of the protocol, which does not on its face require isolation for inmates whose draining wounds may be contained with bandages.  Nevertheless, the Court has assumed that prisoners with draining MRSA wounds, regardless of their bandaging, are to be

medically isolated.  Finally, the Court has assumed that the MRSA education mentioned in the protocol is not satisfied when jail officials merely advise inmates of the precautionary measures applied to contain or prevent MRSA infections without simultaneously discussing the nature of MRSA itself.  In other words, the Court has assumed that merely because Nurse Tarver and other jail officials initially advised all inmates, and specifically advised those suspected of MRSA infection, to wash their hands, avoid sharing personal items and maintain personal cleanliness, this cautionary advice was not a sufficient admonition to satisfy the KDOC protocol absent specifically discussing MRSA as a medical condition.

Bearing in mind these assumptions favorable to Wooler, the Court now turns to a series of critical, undisputed facts.  First, Wooler was transferred from cell 140 to cell 147 at the Hickman County jail sometime in July of 2004.   C.P. thereafter arrived at the jail and was placed in cell 147 on September 23, 2004.  Soon thereafter, C.P. showed Wooler an open wound on his leg.  Wooler recalled that the wound "looked pretty bad."  In fact, Wooler described the wound as looking like "a bullet hole."  According to him, C.P. was taking toilet tissue, putting it on his little finger, and trying to clean out the draining leg wound himself.  (Wooler Depo. at 123-126).  During this time immediately after C.P.'s arrival, Wooler and C.P., who had previously been housed together in the Graves County Jail, were in close personal contact in cell 147 and played cards with each other.  During this time, Wooler engaged in the high risk activity of jailhouse tattooing.  Both Wooler and C.P. received a number of jail tattoos from inmate Blalock, who tattooed the two men using the same homemade tattoo machine.

C.P. did not notify Nurse Tarver or any other Hickman County jail medical staff about his draining leg wound, even though Wooler specifically told him that he had better go to

20

the doctor.  (Wooler Depo. at 126-127).  Instead, the MRSA tracking report for October of 2004, indicates that other inmates at the jail reported that C.P. had a draining wound.  On October 11, 2004, the very day that Nurse Tarver received this report, both she and Dr. Smith separately examined C.P., who was initially diagnosed with a suspected staph infection.   Prior to that day, the record is undisputed that no jail official had any inkling that C.P. had an open draining wound caused by a possible staph infection, or MRSA for that matter.

These undisputed facts led to a series of questions asked of Wooler's own medical expert, Dr. Clark, during his deposition.  Dr. Clark during his deposition testimony acknowledged that it was "certainly possible" that Wooler's first definitive MRSA diagnosis of November 2005, was the result of an exposure that occurred *after* his release from the jail. (Clark Depo. at 89).  Both sides agree that no conclusive evidence in the form of lab test results exists to establish that the infections suffered by Wooler, C.P. and M.W. were actually MRSA, as opposed to the more common staph infection.

Nevertheless, the Court again will assume that all of these individuals were conclusively established to have been infected with MRSA during the time of their incarceration at the jail.  Even with this critical assumption, Dr. Clark could *not* testify that it was any more probable that Wooler became infected with MRSA after October 11, 2004, when the jail became aware for the first time of C.P.'s medical condition, than prior to October 11, 2004, when the jailer and the medical staff at the jail were entirely unaware of C.P.'s assumed MRSA infection. In other words, Dr. Clark could not state to a reasonable medical probability that Wooler became infected at a time that the Defendants were even aware of the initial MRSA outbreak at the jail.

Obviously, if the jail Defendants were not aware of C.P.'s MRSA infection at the

21

time of Wooler's possible infection prior to October 11, 2004, they could not have consciously

disregarded a substantial risk as required by the subjective component of the Eighth Amendment

test.  Thus, if Wooler was infected before October 11, 2004, any actions they took from October

11, 2004, onward, considered separately from the medical treatment by of Dr. Smith, could not

be relied on to support Wooler's constitutional claim that the deliberate indifference of the

Defendants caused him to be infected in the first place.  Absent expert testimony by Dr. Clark to

a reasonable medical probability that the jail Defendants' supposedly unconstitutional conduct

caused Wooler's MRSA infection, Wooler's § 1983 claim that the Defendants caused him to

become infected with MRSA must be dismissed.[4]

        Dr. Clark offered no such testimony.  In fact, when asked whether it was more

likely that Wooler was exposed to MRSA prior to October 11, 2004, or on the weekend of

December 4-5, when he changed C.P.'s draining wounds, Dr. Clark responded with, "Equal

opportunity exposure."  Even Dr. Clark believed that it was equally probable that Wooler was

exposed to MRSA before anyone at the jail was aware that C.P. had an open, draining skin

wound.[5]  During his deposition, Dr. Clark was directly asked by counsel, "How do you think

_____

[4] Wooler concedes in his motion in limine (DN 152) at pages 4-5 that "[a]ny evidence in
this case about the source of Mr. Wooler's MRSA infection is plainly beyond the purview of lay
witnesses and is a proper subject of expert testimony under FRE 702. Id.(citing Howard v
Rustin, case no. 06-00200, 2008 WL 1952102 at *4(W.D.Pa. April 28, 2008)).

[5] When Dr. Clark was asked whether it was possible that Wooler's exposure to C.P.'s
draining wound on December 4-5 resulted in the scabbed over skin lesions noted on Wooler
three to four days later, Dr. Clark initially equivocated, saying that such a rapid development of
symptoms "would be a fairly quick sequence of events."  While he initially indicated that such
skin eruptions could scab over within the same period of time, the doctor later testified that he
would not be eager to submit such an opinion to a medical peer review body, adding that, "I
think that it's certainly outside the realm of what I would normally expect during that period of
time."  (Clark Depo. at 105-106).

Wooler got MRSA?"  Dr. Clark's response was, "Well, I'm not sure."  (Clark Depo. at 84).

When advised by counsel that the Defendants' medical expert would testify that it is impossible

to tell if Wooler contracted MRSA at the jail, Dr. Clark responded with the concession, "That

assessment is logical and may be correct."  Id.

These concessions by Dr. Clark put to rest any possible recovery, regardless of

the theory, based on Wooler's exposure to the MRSA bacteria while incarcerated at the jail.

First, no expert can testify with any degree of certainty that Wooler was initially exposed while

incarcerated, as opposed to prior to his transfer from the Graves County Jail or after his release.

More importantly, assuming he was exposed to MRSA at the jail, a reasonable juror could not

find it more probable that Wooler was exposed after October 11, 2004, when the jail first became

aware of the potential outbreak upon Dr. Smith's examination of C.P..  Potential jurors are left

with nothing but sheer speculation on this critical issue of causation given the failure of proof.

A § 1983 plaintiff cannot recover unless he or she establishes a causal connection

between the challenged conduct of the defendants and the harm suffered.  Lopez v. McGrath,

Case No. C04-4782MAHP, 2007 U.S. Dist. LEXIS 39409 (N.D. Cal. May 31, 2007) (citing Leer

v. Murphy, 844 F.2d 628, 633-34 (9th Cir. 1988)).  Consequently, an alleged violation of a

federal right will result in damages only when the plaintiff is able to prove that the alleged

violation proximately caused his or her injury.  Horn, 22 F.3d at 659; Stachura, 477 U.S. at 307

("The basic purpose of § 1983 is to compensate persons for injuries that are caused by the

deprivation of constitutional rights.").  Accordingly, a plaintiff in a § 1983 action to avoid

summary judgment must, at a minimum, come forward with such evidence that a reasonable

juror could find by a preponderance of the evidence to a reasonable medical probability that the

alleged constitutional violation (conscious disregard of a serious risk of MRSA infection) caused the plaintiff's injury.  Doe, 956 F.2d at 550 (proximate causation is an essential element of a  § 1983 claim for damages). As Wooler acknowledges in his motion in limine (DN152, p.4-5), when a plaintiff's § 1983 claim of deliberate indifference involves a sophisticated medical condition, plaintiff must come forward with expert testimony sufficient to show causation. Alberson, 458 F.3d at 765-66; Gibson, 433 F.3d at 642-43 ("Proof of causation by expert testimony is required when a plaintiff is complaining about treatment of a sophisticated injury, however.")(citing Robinson v. Hager, 292 F.3d 560, 564 (8th Cir. 2002). See gen. Fed. R. Evid. 702.

   A review of various § 1983 cases that have similar causation problems in the context of Eighth Amendment claims shows that judgment as a matter of law in favor of the Defendants is compelled in this case.  One such case is Popoalii v. Correctional Medical Services, 512 F.3d 488, 498-99 (8th Cir. 2008).  Popoalii involved an action brought by an inmate who alleged that she was rendered blind due to the inappropriate medical care she received for cryptococcal meningitis by the defendant care provider, CMS.  During deposition, Popoalii's medical expert, Dr. Dryer, testified that cryptococcal meningitis can result in blindness in one of two fashions - - (1) either by swelling of the brain with resulting increased cranial pressure on the optic nerve; or (2) by a direct fungal invasion of the optic nerve.  Id. at 498.  The doctor explained that only if Popoalii's blindness was caused by intracranial pressure would prompt medical treatment in relieving that pressure have reduced the chance that Popoalii would become blind.  The doctor, however, could not opine whether Popoalii's blindness was caused by the intracranial pressure or by the fungal infection of the optic nerve.  Because Dr. Dryer could not

testify to a reasonable medical probability as to which of these two possible causes resulted in Popoalii's blindness, the district court granted summary judgment to the defendants on Popoalii's § 1983 claim.  The district court also rejected a subsequent contradictory affidavit offered by Dr. Dryer to attempt to cure his earlier testimony with the opinion that had the defendants timely tested and monitored Popoalii's intracranial pressure, they could have likely prevented her blindness.  Id.

While the Popoalii decision obviously does not involve a condition such as MRSA, the direct parallel to the present case is equally clear.  Dr. Clark cannot say with any degree of certainty whether Wooler became infected prior to October 11, 2004, or at some later date such as the weekend during which he changed C.P.'s bandages on December 4-5.  Either possibility is equally probable in Dr. Clark's mind.  That being the case, a reasonable juror could not find to a reasonable medical probability that Wooler became infected at a time when the Defendant jailers were even aware of C.P.'s probable MRSA condition.  As previously noted, the Defendants cannot be deliberately indifferent to a substantial risk of which they are not aware.

Popoalii is far from the only case on this point.  Another example is Alberson v. Norris, 458 F.3d 762, 765-66 (8th Cir. 2006), wherein a prisoner suffering from a sophisticated medical condition known as Goodpasture Syndrome, alleged that corrections medical personnel should have provided different treatment or diagnosed his fatal illness earlier.  Once again the Eighth Amendment claim was rejected in the absence of expert proof of causation.  On this point, the Eighth Circuit agreed with the district court that the § 1983 claim of the deceased prisoner failed for lack of proof of causation to show that the lack of proper medical treatment

25

caused her late husband's death.  In the words of the court, the absence of acceptable proof of causation was "fatal to [her] deliberate indifference claim as a matter of law."  Id. (citing Robinson v. Hager, 292 F.3d 560, 564 (8th Cir. 2002)).  Although Wooler does not have a complete failure to come forward with any proof of causation, the proof he offers is clearly inadequate to satisfy his burden.  Based on the evidence before the Court, Wooler could not survive a motion for directed verdict at trial.

A Sixth Circuit case that discusses the requirement of causation in the context of a §1983 action is Horn by Parks v. Madison County Fiscal Court, 22 F.3d 653, 659 (6th Cir. 1994). Horn involved a § 1983 suit brought by the guardian of a minor, who injured himself during a suicide attempt at an Ohio adult jail facility.  Plaintiff brought suit against the county, arguing that the injured youth was improperly placed in the adult facility in violation of the state's Juvenile Justice Act.  Despite the defendant's clear violation of the Act, the Sixth Circuit concluded that judgment for the defendants was appropriate in the absence of any proof that tended to show that the adult nature of the detention center, as opposed to a secured juvenile facility, contributed in any way to the injured youth's attempted suicide or his resulting injuries. Id.  See also Ealy v. City of Dayton, 103 F.3d 129 at *4 (6th Cir. 1996) (Plaintiff's failure to establish that the excessive force used against him proximately caused his injuries justified entry of a verdict for the defendant.).

Our sister district in Reeves v. Ratliff, Case No. 05-CV-112HRW, WL 1719970 (E.D. Ky. July 21, 2005), recently explained that, "When the theory of causation is a matter of pure speculation and is nothing more than a hypothetical argument, the pleadings are insufficient to sustain a defensible § 1983 claim."  Id. at *2 (citing Horn, 22 F.3d at 659).  Here, a juror

26

would necessarily be required to speculate on the vital question of when Wooler was exposed to MRSA.  Because it is equally probable that he was exposed at a time when none of the jail medical staff were aware that C.P. presented an existing MRSA risk, all of the Defendants are entitled to summary judgment as a matter of law on this particular § 1983 claim.  Wooler has failed to come forward with sufficient proof of causation on which a reasonable juror could return a verdict for him on his § 1983 claim to the extent that his constitutional and state claims rest on his exposure to MRSA, rather than his medical treatment from Dr. Smith.

In reaching this conclusion, the Court also has considered the related causation arguments Plaintiff offered in his response to the motion of the Defendants to exclude the opinions of Dr. Clark (DN  90) and in his own motion in limine to exclude evidence of his possible exposure to MRSA prior to detention in the jail (DN 152). Plaintiff argues in his response that the Defendants have taken portions of the doctor's deposition testimony out of context in their efforts to challenge the causation element of his § 1983 deliberate indifference claims (Id. at p. 10).  Specifically, Plaintiff points to the deposition answers of Dr. Clark from pages 37-38 and page 84 of the doctor's November 20, 2007 and April 15, 2008 depositions respectively, which are quoted at pages 10-11 of the response. (DN 90, p. 10-11).  Plaintiff highlights the portion of the doctor's November 2007 testimony whereat he states that, based on the evidence and history a person gives, the activities that an individual has been involved in put him at risk for being infected or in contact with MRSA (Id.).  The doctor then immediately continues to add that, "**And in the absence of any other documented evidence that there were, quote, 'high-risk activities'** one would be hard-pressed to say that this [bandage changing Plaintiff performed on C.P.] is not the leading potential point or nidus of infection in this

27

particular individual." (Dr. Clark depo. Nov. 20, 2007 pages 37-38)(emphasis added).[6]

Plaintiff similarly quotes that portion of Dr. Clark's testimony from his April, 15, 2008 deposition whereat the doctor explains that, although he is not sure exactly when and how the Plaintiff's exposure to MRSA took place while he was housed at the jail, at the top of the doctor's epidemiological list were the facts that (1) Plaintiff shared the same cell with C.P., (2) he was in close contact with C.P. and actually touched him while changing his bandages, (3) the two men shared the same toilet and (4) sat on the same bunk. (Clark depo. April 15, 2008 p. 84). All of these factors were "at the top of the list" in Doctor Clark's mind to explain how the Plaintiff was infected with MRSA.

From these two deposition excerpts, Plaintiff concludes that while the doctor may have been unsure about which of the possible contacts caused the Plaintiff's MRSA infection, the doctor's testimony left no doubt about his opinion that Plaintiff was infected with MRSA while housed at the Hickman County Detention Center.[7]  That may be a possibility, and the Court has assumed it to be so for the purpose of its analysis, but the doctor's opinion misses the crucial point for the purposes of the Plaintiff's § 1983 deliberate indifference claims arising from his infection with MRSA.  Merely contracting MRSA at the jail will not be sufficient to support the Plaintiff's Eighth Amendment claim of deliberate indifference.

Defendants may only be held responsible in that regard if Plaintiff shows by a

_____

[6] None of the named Defendants can be held liable for the actions by the unnamed jail guards who requested that Wooler assist C.P. with the bandage changes.  The record is devoid of any proof that the named Defendants were aware of or approved those actions which were in direct violation of written jail policy prohibiting inmates from assisting in any medical treatment.

[7] In his own motion in limine (DN 152), Wooler argues at pages 7-8 that the "proper avenue" to challenge causation is to question the events that transpired in cell 147.

preponderance of the evidence that the Defendant jail officials and doctor  consciously

disregarded a known substantial risk of the Plaintiff becoming infected with MRSA *and* their

disregard caused the Plaintiff's resulting serious physical injury– his infection with MRSA.

      Here Dr. Clark testified that it was equally probable that the Plaintiff became

infected *before*  the Defendants first became aware of inmate C.P.'s MRSA infection on October

11, 2004 as it was probable that he became infected thereafter, such as when he changed C.P.'s

bandages on December 4-5, 2005. (DN 81, Exh. B. Clark depo. p. 85-86, 88).  In other words,

Dr. Clark could not testify, and did not express an opinion, that the Plaintiff was more likely

infected with MRSA after the Defendants first became aware on October 11 that one of their

inmates, C.P., was infected.[8]  Absent expert testimony on which a reasonable juror could

conclude by a preponderance of the evidence that Plaintiff became infected because Defendants

consciously disregarded a substantial risk of MRSA infection, summary judgment must be

entered for the Defendants on this claim.  Phillips v. Roane County, Tenn., 534 F.3d 531 (6th

Cir. 2008)("It is axiomatic that an 'official[ ] who lacked knowledge of a risk cannot be said to

have inflicted punishment.'")(citing,  Farmer v. Brennan,, 511 U.S. 825, 844 (1994)); Perez v.

Oakland County, 466 F.3d 416,(6th Cir.2006) ,cert. denied , 128 S.Ct. 166, 169 L.Ed.2d 33, 75

(U.S. 2007)(" The subjective component requires that an official who actually knew of the

---

[8] To quote the relevant portion of Dr. Clark's testimony:

Q.    The question that I was getting ready to ask is, would you agree with me that it's probably
more likely that Mr. Wooler was exposed to the MRSA bacteria in October 2004 during the two
week period or so that Mr. [C.P.] had a draining would in the cell that was not bandaged, and,
therefore, which caused his later infection than it was that when he assisted him in changing his
bandages in December of '04, when he used gloves and washed his hands?

A.    Equal opportunity exposure.  One is probably just as– just as probable as the other."

serious medical need possessed "a sufficiently culpable state of mind in denying medical

care.")(citing <u>Miller v. Calhoun County</u>, 408 F.3d 803, 813 (6th Cir.2005) (quoting Farmer, 511

U.S. at 834, 114 S.Ct. 1970).


b.   **Wooler's Confinement and Medical Treatment**
     **After Oct. 11, 2004, and up to his Release on Sept. 30, 2005:**
     **Hickman County and the Official Capacity Defendants**.

Plaintiff alleges in his complaint that Hickman County was responsible for the

establishment of the policies at the jail, as well as the employment, training and supervision of its

officers (DN 1, Complaint, p. 4, ¶ 9).  Based on the alleged failure of the county to institute

appropriate policies and procedures at the jail, and its failure to employ qualified jail employees,

Plaintiff claims that he was unnecessarily exposed to and infected with MRSA, an antibiotic

resistant bacteria. (DN 1, p. 7, ¶ 18).

Hickman County is governed by its fiscal court.  KRS 441.025 makes the county

responsible for the incarceration of prisoners.  The statute places the duty on the fiscal court to

maintain a safe, secure and clean jail which complies with the health and life safety standards

defined in state law.  KRS 441.045 requires the fiscal court to prescribe rules for the

government, security, safety and cleanliness of the jail and comfort and treatment of prisoners

consistent with the requirements of state law.  Therefore, Hickman County, through its fiscal

court, is the policymaker for purposes of § 1983 liability. <u>Pembaur</u>, 475 U.S. at 483.

The facts do not support Wooler's contention that policymaking authority over

the jail was delegated to jailer Tarver, and subsequently delegated by the jailer to nurse Tarver

and Dr. Smith when it came to inmate medical care.  Jailer Tarver testified that he generally

30

promulgated policy for the jail and left specific medical policies up to nurse Tarver and Dr. Smith.  The authority to promulgate policy is insufficient to establish an official as the "policymaker" under §1983 unless the official's decisions are final and unreviewable and not constrained by the official policies of superior officials.  <u>Felciano</u>, 985 F.2d at 655.  County Judge-Executive Greg Pruitt testified that jailer Tarver did not have the final word when it came to jail policies, but that "annually the county attorney, the jailer, and I worked through a process of reviewing, amending, and updating, whatever is appropriate."  (DN 87, Exh. W, Pruitt Depo. at 7-8).  The County Judge-Executive specifically recalled reviewing and approving the jail policy at issue in this case as part of an annual review.  (<u>Id</u>. at 9).  When jailer Tarver brought to the county's attention the KCOD protocol for dealing with MRSA and the need for such a policy at the jail, the county gave the responsibility to the jailer for looking at the policy, knowing the policy and implementing it.  (<u>Id</u>. at 9).  The exercise of discretion by the jailer while performing these functions does not make him a "policymaker."  His decisions on policy were not final and were reviewed by the fiscal court.  The argument that Dr. Smith and Nurse Tarver were policymakers as to medical care fail for the same reasons.  All policies, including medical policies, were reviewed by the County Judge-Executive and the County Attorney.

Wooler does not contend that the KDOC protocol adopted by the jail constitutes an unconstitutional policy.  His criticism is that jail officials failed to follow that policy resulting in his constitutional injury.  To prevail, Wooler must show a pattern of prior instances of unconstitutional conduct that demonstrate that the county has ignored a history of such constitutional violations by jail officials so as to be on notice and failed to take corrective action.  <u>Plinton v. County of Summit</u>, 540 F.3d 459, 464-65 (6th Cir. 2008); <u>Memphis Tennessee Area</u>

31

Local, American Postal Workers' Union v. City of Memphis, 361 F.3d 898, 902 (6th Cir. 2004)

("A municipal "custom" may be established by proof of the knowledge of policy making

officials and their acquiescence in the established practice.").

Wooler focuses on the alleged custom and practice in the jail not to isolate

infectious inmates, failure to educate them how to protect themselves, and not to culture inmates

suspected of MRSA infection to determine the appropriate course of treatment. Plaintiff

maintains that these customs and practices violated both the KDOC MRSA protocol and thus the

jail's own written policies.[9]

Such claims in the context of the above case law are clearly insufficient to raise a

triable issue of municipal liability under § 1983. The record is devoid of any proof that the

county was deliberately indifferent to the possibility of MRSA contagion at the jail. In fact, the

jail had not experienced any known MRSA-related infection problems until inmate C.P. was

examined by Nurse Tarver and Dr. Smith on October 11, 2004.

C.P. and M.W. were the very first two inmates suspected of possible MRSA

infection. Accordingly, the proof of record does not support the existence of any longstanding

custom or practice of deliberate indifference with regard to the prevention, diagnosis, control or

treatment of MRSA-infected inmates. There simply is no evidence of record on which a

reasonable juror could find that Hickman County was previously on notice, and chose to

_____

[9] Proof of a violation of state law or a written policy alone is not sufficient to establish liability under § 1983. Municipalities are free to hold their officers to a higher standard than that required by the Constitution, without being subjected to increased liability under §1983. Smith v. Freland, 954 F.2d 343, 347-8 (6th Cir. 1992); Pyles v. Raisor, 60 F.3d 1211, 1215 (6th Cir. 1995). In this case, Wooler's medical expert, Dr. Clark, has opined that the Defendants' alleged failure to follow the KDOC protocol adopted as the jail policy violated the applicable standard of medical care.

disregard, a substantial risk of infection.

Wooler argues in opposition to the summary judgment motions that Defendants' "reckless disregard for the mandatory procedures" set forth in the KDOC protocol is proof of deliberate indifference to his serious medical needs. However, the deposition testimony excerpts and the medical records submitted in support of the briefs simply did not establish any violations of the terms of the KDOC protocol for MRSA healthcare. For example, Nurse Tarver testified that upon arrival at the jail, all new inmates were educated concerning infection prevention practices such as frequent hand washing, appropriate daily hygiene and to avoid the sharing of personal items. (P. Tarver depo. at 108-110). Although Nurse Tarver and the other jail booking personnel did not specifically refer to MRSA, the instructions given to the inmates are the same basic prevention techniques set out in the KDOC protocol. Beyond this education, the record reveals that inmates at the jail were provided with cleaning supplies each morning on a daily basis to clean and decontaminate their surroundings.

No violation of the KDOC protocol resulted from the manner in which the Defendants handled inmate C.P.'s suspected MRSA infection. Although the Plaintiff protests that C.P. should have been placed in isolation, the KDOC protocol for MRSA does not require isolation if an infected inmate's drainage can be contained by appropriate bandaging. Wooler's medical expert, Dr. Clark, concedes that isolation is not mandatory, but is merely an option to consider. Other legitimate concerns of the jail must be considered, such as security classifications, the need for space and overcrowing. (DN 85, Exh. D, Clark Depo. at 94-96). The monthly MRSA report indicates that C.P.'s drainage was so contained prior to the time that he was returned to Cell 147. Thus, this conduct of itself is not evidence of deliberate

33

indifference, nor could it be attributed to the county for the purpose of liability given the absence

of any evidence of a pattern of such a practice.  See Garretson v. City of Madison Heights, 407

F.3d 789, 796 (6th Cir. 2005) (§ 1983 municipal liability claim failed in the absence of evidence

that the city had either a custom of denying medical treatment to inmates or notice of a clear and

persistent pattern of such treatment); Miller v. Calhoun County, 408 F.3d 803, 815-16 (6th Cir.

2005) (a showing of deliberate indifference "typically requires proof that the defendant

municipality was aware of prior unconstitutional actions by its employees and failed to take

corrective measures").

        As for the alleged failure to obtain cultures from inmates believed to be possibly

infected with MRSA, once again, the KDOC healthcare protocol for MRSA does not appear to

require jail officials to obtain a culture in every instance in which an inmate is suspected to be

infected.  Dr. Smith testified at length in his deposition concerning his own treatment practices

with regard to such cultures.  The doctor explained that in his view immediate treatment with

antibiotics approved for the treatment of MRSA and staph infections was more important that

awaiting the culture test results, which could take up to 3-4 days to obtain. (DN 81, Exh. B,

Bruce Smith depo. at 48-49).[10]  Dr. Smith instead simply prescribed medication that he believed

---

[10]  During his deposition, Dr. Smith was asked:

Q.    Why did you not culture an inmate at the Hickman County Detention Center for MRSA
       prior to September of 05?

A.    Well, it was not going to change my treatment.  Cultures don't come back for three or
       four days.  Sometimes it was not ready to be drained.  An abscess can be - - early on it
       can be hard, tender, and red, and I don't like to drain those until they're ready to be
       drained.  Plus, sometimes the inmates were on antibiotics already, and when you try to do
       a culture, and sensitivity on a patient that's been on antibiotic for several days, the result
       is oftentimes not an accurate reflection of what actually is in there because they've been

34

would be effective treatment, and which in almost every instance was effective, in relieving the Plaintiff's immediate symptoms.  When it was not, followup treatment was prescribed.  None of the evidence of record indicates to the Court that the individual jail Defendants engaged in conduct that constituted a violation of the KDOC standard, assuming the KDOC healthcare protocol for MRSA was the appropriate standard of care, or that Hickman County had notice of any such violation so as to be chargeable for it.

        Wooler alleges that the County was deliberately indifferent to his medical needs after he first presented with what he thought was a spider bite on December 7, 2004, and in the treatment of his subsequent infections during 2005.  Hickman County contracted with Dr. Smith to provide onsite health care for prisoners at the jail.  It is not unconstitutional for municipalities to hire independent medical professionals for that purpose, nor is it unconstitutional for municipalities and their employees to rely on medical judgments made by medical professionals responsible for prisoner care.  Graham v. County of Washtenaw, 353 F.3d 373, 384 (6th Cir. 2004).  "The fact that alternative procedures may have better addressed [a prisoner's] particular needs does not show that the [County was] deliberately indifferent to his medical needs." Id. at 384 (quoting Ronayne v. Ficano, 1998 WL 183479 at *3 (6th Cir. 1999) (unpublished opinion)).

        The record establishes that Wooler, as well as the other inmates housed with him in cell 147, received prompt medical treatment whenever the inmates reported what they thought to be spider bites or other skin lesions to nurse Tarver.  The medical care came in almost every instance the same day as the condition was brought to Ms. Tarver's attention.  Dr. Smith testified

_____

        on antibiotics for several days.

(Id. at pp 48-49).

35

that he believed in his best medical judgment that prompt treatment with antibiotics was preferable to a delay caused by culturing the wound.  Once antibiotics are started, any culture would not be accurate.  (Smith Depo. at 48-9).

The KDOC protocol suggested culturing and Plaintiff's medical expert, Dr. Clark, was critical of the failure to culture.  It was Dr. Clark's opinion that a culture would have provided a definitive diagnosis of either MRSA or a staph infection.  With that information, the most effective antibiotic could be prescribed.  Such differences of opinion fail to rise to the level of deliberate indifference.  Id.  "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law."  Westlake v. Lucas, 537 F.2d 857, 860 n. 5 (6th Cir. 1976).

Hickman County is entitled to summary judgment as to all of Wooler's claims.  Official capacity claims are merely another way to state a claim against the County.  Dr. Smith and the Tarvers, in their official capacities, are also entitled to summary judgment.

c.      **Qualified Immunity: Jailer Tarver and Nurse Tarver In their Individual Capacities.**

Qualified immunity exists to protect government officials when they perform discretionary functions.  See gen. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In such situations, defendant officials generally are protected from liability for civil damages so long as their conduct does not violate clearly established constitutional or statutory rights.  Phillips v. Roane County, Tennessee, 534 F.3d 531, 538-39 (6th Cir. 2008).  The federal courts approach the issue of qualified immunity by asking two questions: First, viewing the facts in a light most

favorable to the plaintiff, has the plaintiff shown that a constitutional violation occurred? Second, if so, was the constitutional right clearly established at the time of the violation? Silverstein v. City of Dayton, 440 F.3d 306, 311 (6th Cir. 2006). If the acts, taken in a light most favorable to the plaintiff, fail to show that the defendant officials' conduct violated the plaintiff's constitutional rights, then the inquiry is at an end. Weaver v. Shadowin, 340 F.3d 398, 406 (6th Cir. 2003) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).

Jailer Tarver acknowledged his responsibility for overseeing the day-to-day operation of the jail, as required by Kentucky law (DN 85, Exh. G, R. Tarver depo. at 12-14). Consequently, the jailer admitted that he had a responsibility to protect the inmates in his custody from avoidable MRSA exposure and infection. (Id. at 148). The Court has found that Wooler's claim related to his exposure to MRSA fails as a matter of law for lack of proof of causation. Wooler's failure to identify any proof in the record to establish that Jailer Tarver's conduct caused Wooler to become infected ends the qualified immunity analysis on that claim against Robert Tarver in his individual capacity.

The jailer testified in regard to the medical treatment accorded to prisoners at the jail that he relied on his wife, Nurse Peggy Tarver, to keep him abreast of medical issues involving the jail population. (Id. at 28-31). Consequently, when the jailer received the KDOC healthcare protocol for MRSA in September of 2004, he passed it along to his wife for review; she apparently made Dr. Smith aware of the memo, which was placed in the jail's operations manual. The question now is whether the facts of record, viewed in a light most favorable to Wooler, establish that a constitutional violation occurred after October 11, 2004.

Liability under §1983 must rest on more than the doctrine of *respondeat superior*

37

or the mere right to control employees.  Phillips v. Roane County, Tennessee, 534 F.3d 531, 543 (6th Cir. 2008) (citing Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999)).  Jailer Tarver accordingly will not be liable pursuant to § 1983 for an alleged failure to act unless he either encouraged the specific misconduct or in some way directly participated in it.  Id.  At a very minimum, Plaintiff must show that the jailer at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the defendant jail officials.  See Hays v. Jefferson County, 668 F.2d 869, 874 (6th Cir. 1982); Grinter v. Knight, 532 F.3d 567, 575-76 (6th Cir. 2008) (proof of personal involvement is required for a supervisor to incur personal liability) (citing Miller v. Calhoun County, 408 F.3d 803, 817 n.3 (6th Cir. 2005)).  Further, supervisory liability under § 1983 cannot rest upon a mere failure to act, but must instead be based on some active unconstitutional behavior.  Spencer v. Bouchard, 449 F.3d 721, 730 (6th Cir. 2006) (citing Combs v. Wilkinson, 315 F.3d 548, 558 (6th Cir. 2002)).

It is not unconstitutional for Jailer Tarver to rely on medical judgments made by medical professionals responsible for prisoner care.  Graham, supra. at 384.  Jailer Tarver's sole involvement with the medical needs of prisoners at the jail appears to have occurred on those occasions that he drove prisoners to Dr. Smith's off-site office for examination and treatment. Jailer Tarver did not examine prisoners, diagnosis their medical problems or provide treatment for them.  All of these matters were handled by his wife, RN Peggy Tarver, and Dr. Bruce Smith. Consequently, Robert Tarver appears to have played no role in the manner in which the Plaintiff was treated for his MRSA infection.

Just as importantly, the Court has determined, as discussed in the preceding section, that the conduct of Nurse Tarver and the jail medical personnel did not constitute

38

deliberate indifference in the manner in which they handled those prisoners suspected of possible MRSA infection.  The initial two prisoners, C.P. and M.W., were examined by Nurse Tarver and Dr. Smith.  Both men were prescribed antibiotics appropriate for the treatment of MRSA, instructed on hand washing and personal hygiene, and provided follow-up medical treatment in the form of an extension of their respective antibiotic prescriptions.  The only faults now suggested by the Plaintiff, the failure to isolate C.P. or to culture the skin lesions of inmates suspected of MRSA infection, have been determined not to constitute deliberate indifference by those jail officials directly involved.

Even if immediate mandatory isolation in all MRSA suspected cases and universal culture tests might have better served the medical needs of the inmates at the jail, the fact that Dr. Smith and Nurse Tarver employed alternative procedures does not indicate deliberate indifference to the Plaintiff's medical needs.  See Ford, 535 F.3d at 498-99 (discussing Graham v. County of Washtenaw, 358 F.3d 377, 380 (6th Cir. 2004) ("[T]he fact that alternative procedures may have better addressed a prisoner's particular needs does not show that the [defendant] county was deliberately indifferent to his medical needs.")).  Thus, while a universal policy of isolation and culturing every prisoner suspected of MRSA infection might represent an ideal approach in terms of infection prevention and treatment, the conduct of the Defendants in repeatedly prescribing antibiotics believed to be appropriate for MRSA treatment and in bandaging draining skin abscesses, while returning the affected prisoner to the general population, did not constitute deliberate indifference, nor even a violation of the KDOC healthcare protocol for MRSA in the Court's view.

Indeed, even Dr. Clark in his own deposition testimony acknowledged that

cohorting (or isolating) prisoners presents complex questions given jail security classification, space limits and overcrowding. Consequently, Dr. Clark expressed the view that isolation of possibly infected inmates is "an option" to be considered. (DN 85, Exh. D., John Clark depo. at 94-96). The decision of Nurse Tarver not to exercise this option initially does not mean that she consciously disregarded a substantial risk of serious injury but only that she elected a course of action that she believed to be an appropriate response, one approved by the KDOC health care protocol for MRSA.

As for the bandage changing incident during the weekend of December 3-4, this incident occurred without the knowledge, much less the involvement of either Robert Tarver or his wife Peggy Tarver. The unnamed jail officer who permitted the Plaintiff to change C.P.'s soiled dressings that weekend acted directly in violation of the jail's own policy that prohibited inmates from performing such medical procedures in the jail. Obviously, if the Tarvers were not aware of the incident, much less involved, neither of them can be held liable under § 1983 for the unanticipated policy violation of the unnamed jail employee.

Wooler has failed to identify any evidence of record upon which a jury could find that Jailer Tarver violated his Eighth Amendment right to adequate medical care. The qualified immunity analysis accordingly ends there, as no constitution violation has been shown. Jailer Tarver is entitled to the dismissal of Wooler's constitutional claims as a matter of law.

For Nurse Tarver to be liable to the Plaintiff under § 1983, there must be proof that she was deliberately indifferent to Wooler's serious medical needs during his incarceration. Her conduct will not be a sufficient basis on which to impose liability if the facts of record would suggest to a reasonable juror at most that Nurse Tarver was merely negligent, rather than

40

deliberately indifferent of the substantial risk of infection.  Mere negligence is not a sufficient basis on which to impose § 1983 liability.

The Court has previously discussed those examples of conduct that the Plaintiff now offers up as proof of deliberate indifference.  The Plaintiff's case in this regard rests on the failure to timely isolate inmate C.P. upon becoming aware of his possible infection, the failure to adequately educate the inmates concerning the risk of MRSA, and the failure to culture all inmates suspected of MRSA infection.

As previously noted, every inmate upon arrival was given basic hygiene instructions concerning hand washing, daily showering, and avoiding sharing personal items. Inmates suspected of MRSA infection were again admonished by both Dr. Smith and Nurse Tarver concerning the need for frequent hand washing, disposal of towels and linens, and other basic infection control measures.  Cleaning supplies were provided to the inmates in cell 147 on a daily basis.  After inmate C.P. was determined to be infected, Nurse Tarver had the jail cells disinfected and purchased additional linens and towels for use by the inmates.  The decision of Nurse Tarver to return C.P. to cell 147 after his draining wound was bandaged was not an example of deliberate indifference by Nurse Tarver, but only an alternative response to C.P.'s possible infection. Harrison v. Ash, 539 F.3d 510, 519 (6th Cir. 2008)("[I]n cases where prison officials "actually knew of a substantial risk to inmate health or safety[, they] may be found free from liability if they reasonably respond to the risk, even if the harm ultimately was not averted.")(citing Farmer, 511 U.S. at 844).

Nurse Tarver's decision in this regard was not contrary to the protocol contained in the KDOC healthcare protocol for MRSA, which itself did not establish a policy of universal

isolation of all MRSA-infected individuals. So long as the drainage from the affected prisoner's abscess was contained by his bandages, the KDOC protocol permitted the prisoner to be returned to the general population.  Her reasonable response to the risk precludes her §1983 liability.

On each occasion that a prisoner complained to Nurse Tarver about a healthcare problem involving skin lesions, the record reflects that Nurse Tarver examined the affected prisoner, referred him to Dr. Smith if necessary for same-day treatment with antibiotics.  Upon return, the prisoner was instructed again on personal hygiene. Such conduct simply does not constitute deliberate indifference to the Plaintiff's serious medical needs.  Mere disagreement with the nature of one's medical treatment is not sufficient, standing alone, to constitute deliberate indifference to a serious medical need.  See Alberson v. Norris, 458 F.3d 762, 765-66 (8th Cir. 2006) (Prison officials were not deliberately indifferent to the plaintiff prisoner's suffering so as to violate the Eighth Amendment where the prisoner received extensive and repeated medical treatment from a physician on six separate dates over the course of several months).

Nothing in the record suggests that Nurse Tarver was deliberately indifferent to the substantial risk of MRSA infection in the inmate population at the jail.  The undisputed facts set forth above do not rise to the level of establishing her deliberate indifference to the risk of MRSA infection and Plaintiff has cited no federal case in which a similarly situated jail or prison official has been found to be deliberately indifferent under circumstances similar to those present in this case.  Because Plaintiff has failed to identify any facts to show that Nurse Tarver violated his constitutional rights, Nurse Tarver is entitled to qualified immunity and also should be dismissed by way of summary judgment.

**d.      Treatment-Related Claim Against Dr. Smith.**

Wooler maintains that Dr. Smith was deliberately indifferent in his medical treatment of Wooler due to his refusal to obtain a culture that would enable the doctor to conclusively determine whether Wooler had a particular strain of MRSA and how best to treat that strain.[11]   Because the doctor would not obtain a culture to conclusively establish the existence of Wooler's MRSA infection, Wooler maintains that the doctor, on more than one occasion, prescribed him the medication Keflex that was ineffective to appropriately treat his condition.   Accordingly, Wooler concludes that the doctor consciously disregarded the substantial risk that Wooler would suffer serious harm from ineffectively treated MRSA.   What we have here is not a mere difference of opinion concerning the method of treatment, according to Wooler, but rather the absence of a necessary exercise of medical judgment on Dr. Smith's part that constitutes deliberate indifference to Wooler's serious medical needs and resulted in his permanent injury.

The deliberate indifference standard of the Eighth Amendment is a stringent standard that requires more than mere negligence or medical malpractice to satisfy. Harrison v. Ash, 539 F.3d 510, 518 (6th Cir. 2008)("The Court has noted, however, that the term deliberate indifference "describes a state of mind more blameworthy than negligence." Farmer, 511 U.S. at 835.   Indeed, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 105); Ford v. County of Grand Traverse, 535 F.3d 483, 495 (6th Cir. 2008)("Mere negligence or malpractice is insufficient to establish an Eighth Amendment violation.")(quoting, Bowman, 350 F.3d at 544 (citing Estelle, 429 U.S. at 106 n.

---

[11]  Dr. Smith did not plead the qualified immunity defense.

14, 97 S.Ct. 285)).  Consequently, as long as the defendant physician exercises his or her

professional judgment in determining the nature and course of the treatment, if any, provided,

such behavior will not violate the prisoner's constitutional rights.  Brown v. Borough of

Chambersburg, 903 F.3d 274, 278 (3rd Cir. 1990)(citing Youngberg v. Romeo, 457 U.S. 307,

322-23 (1982).  Indeed, even an incorrect assessment of the benefits and costs of medical

treatment is considered to be mere negligence and not an Eighth Amendment violation.  Johnson

v. Phelan, 69 F.3d 144, 150 (7th Cir. 1995).

> Here, the undisputed material facts show that Dr. Smith initially examined

Wooler on January 18, 2005.  On that occasion, he noted "several skin infections, old and new"

for which he prescribed a two-week course of Bactrim.  Jail medical staff noted that by February

2, 2005, Wooler's infection had healed.  The following month on March 7, 2005, jail medical

staff noticed several abscesses on Wooler's body.  He was immediately taken to Dr. Smith and

examined the same day.  Dr. Smith diagnosed "possible recurring staph infection" and again

provided a ten-day prescription of Bactrim, the same medication that had previously proved to

be effective.  The doctor drained the abscess the following day and the Bactrim prescription was

extended an additional five days due to the presence of redness and pain in the abscess.

> The following month Wooler returned to Dr. Smith's office on April 19, 2005,

with another skin abscess.  Dr. Smith on this occasion prescribed a ten-day course of Keflex.

The MRSA tracking report indicates that Wooler was placed in medical isolation on this

occasion, as he "would not keep his hand off wound."  By June 14, Wooler was noted to have

another open draining wound on his back.  Once again, he was immediately taken to the doctor's

office.  Dr. Smith prescribed another ten-day course of Keflex.  When Wooler's infection

returned the following month in July, he was taken back to Dr. Smith on July 13, 2005, for a recurring skin ulcer, "most likely MRSA." On this occasion, Dr. Smith prescribed Clindamycin along with Mupriecin. Wooler, however, subsequently refused to take many of the Clindamycin doses as well as five of the Mupriecin. Dr. Smith was notified of Wooler's refusal to take his prescribed medication and advised Nurse Tarver that if Wooler showed no signs of infection he would be okay.

That August, Wooler returned to the doctor after he was noted to have a non-draining ulcer on his thigh. Once again, Wooler was started on Clindamycin. By September 7, 2005, his first ulcer had fully healed. After he developed another ulcer, Wooler was taken to Dr. Smith on September 19, 2005, and again placed on a ten-day course of Clindamycin, four tablets per day. By the time of his release 11 days later on September 30, 2005, Wooler was noted in the MRSA tracking report for September to have no skin infections.

Several observations immediately come to mind from these undisputed facts. First, Dr. Smith never obtained a culture at any time during the nine months that he treated Wooler[12]. Second, Wooler had immediate access to medical treatment by Dr. Smith, who never

---

[12] Dr Smith, when asked during his deposition why he did not culture inmates for MRSA, responded:

> A. Well, it was not going to change my treatment. Cultures don't come back for three or four days. Sometimes it was ready to be drained. An abscess can be– early on it can be hard, tender, and red, and I don't like to drain those until they're ready to be drained. Plus, sometimes the inmates were on antibiotics already, and when you try to do a culture, and sensitivity on a patient that's been on an antibiotic for several days, the result is oftentimes not an accurate reflection of what actually is in there...."

(Smith depo. July 6, 2007 at pp. 48-49).

declined to examine Wooler, and on every occasion mentioned above, prescribed an antibiotic

medication regiment to treat Wooler's skin eruptions.[13]   Third, the doctor's treatment, while not

always successful, was medically beneficial to Wooler on most occasions, as confirmed by the

MRSA tracking records, which indicate that Wooler's skin eruptions had healed.

These circumstances make it extremely difficult for the Court to find a basis on

which a reasonable juror could determine by a preponderance of the evidence that Dr. Smith,

while fully aware of his patient's probable MRSA infection, consciously disregarded the

substantial risk of harm with the result of wantonly or recklessly inflicting injury and pain on

Wooler.  All that Wooler can point to in this regard is the doctor's failure to obtain a culture for

laboratory testing to confirm the presence of MRSA.  Yet, Dr. Smith testified that he treated

Wooler on the assumption that Wooler did have MRSA.  Accordingly, the doctor prescribed

those drugs which he believed would be effective, and in most instances were effective, for

Wooler's suspected MRSA condition.

Such undisputed circumstances, as a matter of law, simply do not rise to the level

of deliberate indifference to Wooler's serious medical needs, so as to state a viable §1983 claim

arising under the Eighth Amendment.  Numerous cases have rejected such arguments in similar

context.  See Williams v. MacArthur, 207 WL 1381764 at *1, 5 (D. Nev. May 8, 2007) (Initial

---

[13] Dr. Smith in explaining his antibiotic treatment regimen testified further that:

A.  Well, the treatment even for MRSA is common antibiotics. Bactrim and other
antibiotics, doxycycline, can be used.  If it is MRSA, you can still use antibiotics.
The antibiotics I put these people on are generally effective against MRSA.
Keflex is not effective, but I did use Keflex on some antibiotics– on patients in
the jail who had abscesses, and they got better."

(Smith depo. at pp. 66-67).

misdiagnosis of prisoner's MRSA as spider bites and ongoing disagreement concerning the

proper antibiotics to treat the condition did not give rise to an Eighth Amendment claim.); Green

v. FDC Philadelphia, 2007 WL 247911 at *2 (E.D. Penn. Jan. 24, 2007) (Medical treatment that

plaintiff received for his pimples, boils and other skin conditions, which the plaintiff alleged that

medical providers failed to properly diagnosis as MRSA, while perhaps malpractice did not rise

to the level of an Eighth Amendment violation where plaintiff received medical treatment albeit

errant.).  See gen. Kennedy v. Fox, 2005 WL 2897084 at *4 (D.S.C. Oct. 27, 2005) (While the

provision of medical care by prison officials is not discretionary, the type and amount of medical

care received by prisoners is discretionary.);Kalina v. King County Jail, 2006 WL 4093686

(W.D.Wash. Dec 26, 2006)(denial of inmates request for nasal culture for MRSA and nasal

decolonization therapy was not deliberate indifference where plaintiff did not meet treatment

criteria employed by treating medical facility) .  The present undisputed circumstances regarding

Dr. Smith's treatment of the Plaintiff indicate to the Court that Wooler's § 1983 claim against the

doctor should be dismissed as well.

Dr. Smith exercised his medical discretion to immediately begin treatment of

Wooler's skin infections with antibiotics that he testified he believed would be effective against

MRSA.  The fact that he chose not to obtain a culture, or used one particular antibiotic rather

than another one,[14] was merely an exercise of the doctor's medical discretion.  While Wooler

may reasonably disagree with this exercise of discretion, such differences of opinion are not an

---

[14] On this point the Court notes that even Dr. Clark in his own deposition testimony
indicated that the standard antibiotics prescribed for MRSA included Bactrim, Rifampin and
Clindamycin, the very same antibiotics that Dr. Smith provided on several occasions to the
Plaintiff in this case. (Dr. Clark depo. April 15, 2008, p. 26).

adequate basis for a claim of deliberate indifference to Wooler's serious medical needs. <u>Banks v. County of Allegheny</u>, 568 F.Supp.2d 579, 584-85 (W.D.Pa. Jun 30, 2008)(prisoner plaintiff who alleged merely that his MRSA treatment with doxycycline constituted deliberate indifference failed to allege a viable eighth amendment claim where the record showed he was not denied treatment but was provided medication that his treatment provider believed appropriate.)   The undisputed material facts entitle the doctor to summary judgment in his favor on this claim.

**e.     State Law Negligence Claims.**

    The Court similarly concludes that Wooler has failed to establish a genuine issue of material fact sufficient to survive summary judgment on his state law negligence claim against Dr. Smith.  A claim for medical malpractice in Kentucky in almost every instance requires expert testimony to establish that the challenged conduct of the physician failed to satisfy the standard of care of a reasonably competent physician under similar circumstances.  <u>See gen.</u> <u>Morris v. Hoffman</u>, 551 S.W.2d 8, 9 (Ky. App. 1977).  <u>See gen.</u> <u>Reams v. Statler</u>, 642 S.W.2d 586, 588 (Ky. 1982); <u>Blair v. Eblen</u>, 461 S.W.2d 373 (Ky. 1970).  Only when the condition and injuries are of such a nature that any layman is competent to pass judgment and conclude from common experience that such injuries do not happen in the presence of proper skill and care will expert testimony be unnecessary to establish a claim of medical malpractice under Kentucky law. <u>Perkins v. Hausladen</u>, 828 S.W.2d 652, 654-55 (Ky. 1992).  The only other exception to the requirement for expert medical testimony in cases of medical malpractice arises if the defendant physician makes admissions of a nature from which the jury can infer that he or she acting negligently.  <u>See</u> <u>Baptist Healthcare Systems, Inc. v. Miller</u>, 177 S.W.3d 676, 681 (Ky. 2005);

48

Perkins, 828 S.W.2d at 655.  Neither of these exceptions applies in the present case.

Accordingly, Wooler must point to expert testimony that establishes the proper standard of

medical care; Dr. Smith's violation of such standard; and, that such violation caused the injuries

to the Plaintiff.  Jarboe v. Harting, 397 S.W.2d 775 (Ky. 1965).

   Here, we have no expert testimony that the appropriate standard of medical care

imposed a duty on Dr. Smith to obtain an immediate bacterial culture to conclusively diagnosis

Wooler's staph infection as being MRSA.  Dr. Clark did not testify that Dr. Smith's failure to

obtain a culture from Wooler was a violation of the standard of medical care amounting to

medical negligence.  Indeed, Dr. Clark expressed no view on whether the treatment regimen

prescribed by Dr. Smith violated any standard of medical care for the treatment of MRSA.  Dr.

Haas acknowledged that even physicians within the KDOC did not always obtain cultures before

treating suspected MRSA patients.  (DN 93, Haas Depo. Exh. A1-3).  Thus, the record contains

no expert testimony from which a reasonable juror could conclude that Dr. Smith had an initial

duty to obtain a culture in order to satisfy the applicable standard of medical care or that his

failure to do so caused Wooler's claimed injuries, given the doctor's testimony that his treatment

would not have varied in any event.

   Absent this required expert proof, Wooler's claim of negligence against Dr. Smith

must also be dismissed as a matter of law.  See gen. Jenkins v. Best, 250 S.W.3d 680, 688 (Ky.

App. 2007) (Medical negligence cases, like any negligence cases, require proof that the

defendant owed the plaintiff a duty of care which the Defendant breached resulting in injury to

the plaintiff.).  The same is true of Dr. Smith's decision to prescribe Keflex on two occasions.

No expert has testified that treatment with Keflex violates the appropriate standard of medical

care. In the absence of expert medical testimony to establish that standard of care and the resulting breach of duty to Wooler causing his injuries, the doctor's motion for summary judgment on all claims against him must be granted in this instance.

Finally, the remaining state law claims against the County, Jailer Tarver and Nurse Tarver must be dismissed.  The elements of negligence are duty, breach of duty, and resulting injury.  Workman v. Columbia Natural Resources, 864 F.Supp. 638, 641 (E.D. Ky. 1994) (citing Watters v. TSR, Inc., 904 F.2d 378, 380 (6th Cir. 1990)).  For the reasons stated above, Wooler's claims based on the contention that he contracted MRSA while incarcerated at the Hickman County Jail fail as a matter of law for lack of proof of causation.  His medical treatment claims fail since he has not produced any evidence that the Defendants breached a duty of care owed to him.


## CONCLUSION

By entry of a separate order, all claims against Hickman County and Defendant Robert Tarver, Peggy Tarver and Dr. Bruce Smith in their official capacities are **DISMISSED WITH PREJUDICE**; all claims against Defendant Robert Tarver and Peggy Tarver in their individual capacities are **DISMISSED WITH PREJUDICE**; all claims against Dr. Bruce Smith are **DISMISSED WITH PREJUDICE**.